## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **DEMETRIUS TUCK,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **1:17-CV-8-KOB** |
| **MARK T. ESPER,** | ] | |
| **Secretary of the Army,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

This employment discrimination matter is before the court on Defendant Mark T. Esper's (the "Army") motion for summary judgment. (Doc. 20). Plaintiff Demetrius Tuck, a former mechanic at the Army Depot in Anniston, Alabama, asserts that a mid-level manager at the Depot, who harbored a dislike for individuals with post-traumatic stress disorder, devised a conspiracy to strip him of his employment. Mr. Tuck brings his claims primarily under the Rehabilitation Act, and he specifically alleges disparate treatment, failure to accommodate, retaliation, and hostile work environment. The Army moves for summary judgment on all of Mr. Tuck's claims.

Accused by coworkers of making violent threats and of sexual harassment, Mr. Tuck fails to bring forward the necessary evidence to substantiate his broad allegations. As to his failure-to-accommodate claim, Mr. Tuck failed to show that he requested a *reasonable* accommodation for his disability. The court will GRANT the Army's motion for summary judgment in all respects. The court discusses the specific factual and legal reasons for its conclusion in more detail below.

## PROCEDURAL HISTORY

Mr. Tuck filed this employment discrimination lawsuit on January 3, 2017, alleging disparate treatment based on disability (Count 1); failure to accommodate a disability (Count 2); retaliation for complaining about disability and racial discrimination (Count 3); interference with leave under the Family Medical Leave Act (Count 4); hostile work environment (Count 5); and violations of 42 U.S.C. § 1983 (Count 6).  Mr. Tuck premised his claims on violations of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, the Rehabilitation Act, 29 U.S.C. § 706, *et seq*, and the FMLA, 26 U.S.C. § 2612(a)(1).  Mr. Tuck based his retaliation claim on his complaints to the EEOC, which included racial discrimination claims alongside his disability discrimination claims.  Mr. Tuck's retaliation claim thus implicates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as well as the Rehabilitation Act.

The Army moved to dismiss many of Mr. Tuck's claims for lack of subject matter jurisdiction.  Specifically, the Army moved to dismiss all of Mr. Tuck's claims brought under the ADA, the FMLA, § 1983, and certain sections of the Rehabilitation Act.

This court granted the Army's motion, leaving Mr. Tuck's claim in Count 1 for disability discrimination under the Rehabilitation Act; his claim in Count 2 for failure to accommodate a disability under the Rehabilitation Act; his claim in Count 3 for retaliation under Title VII and the Rehabilitation Act; and his claim in Count 5 for constructive discharge under the Rehabilitation Act.  (Doc. 11).  The Army now moves for summary judgment on those remaining claims.

## STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Furthermore, the court must view all evidence and inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

## FACTS

In June 2006, the Army hired Demetrius Tuck, a veteran, as a "General Equipment Helper" at the Anniston Army Depot, which provides maintenance services for various military vehicles. Mr. Tuck's final position with the Army was "heavy mobile mechanic," with his primary task being mechanical work on various parts of the Stryker armored personnel carrier.

In March 2012, a Veterans Affairs physician diagnosed Mr. Tuck with depression and possible post-traumatic stress disorder. (Doc. 29 ¶ 5). Two years later, in May 2014, Mr. Tuck underwent a "formal" test for PTSD, and a month after that, in June 2014, a doctor "formally" diagnosed Mr. Tuck with PTSD. Although the parties dispute whether and when Mr. Tuck's supervisors knew he had PTSD, the court assumes in this Opinion that Mr. Tuck's supervisors were aware that Mr. Tuck had PTSD—or regarded Mr. Tuck as having PTSD—at all relevant times.

Until his 2015 retirement, Mr. Tuck worked as a rank-and-file member of four- or five-person teams maintaining vehicles or specific components of vehicles. A supervisor directly managed several teams and a "Division Chief" managed those supervisors. In addition, each team had a "lead," who acted essentially as the foreperson of the team.

Mr. Tuck's allegations begin in 2012, when the Army assigned David Funderberg as Division Chief for the teams working on the Stryker vehicle during Mr. Tuck's shift. Mr. Funderberg began overseeing the supervisors who oversaw Mr. Tuck. Mr. Tuck offers disjointed evidence about a multitude of alleged events between 2012 and 2015 that ultimately led to his retirement. The court next sets out only the most relevant of these events in chronological order.

### 1. Improper Use of Leave

On April 19, 2012, the Army issued to Mr. Tuck a "letter" instructing him on the proper use of leave. (Doc. 20-2 at 20). The letter stated that Mr. Tuck had used leave excessively and in a way that suggested he required counseling on the proper use of leave. The letter also imposed additional requirements on Mr. Tuck in requesting leave. Mr. Tuck testified that he received "two" or "three" of these letters during his time with the Army, although he did not say at what point in his career the other counseling letters came.

In his deposition, Mr. Tuck acknowledged that he did not always follow the proper procedure for requesting leave, which required that the employee submit a written form and request. Mr. Tuck maintained, however, that the regular practice at the Depot was to orally request and receive time off from supervisors, and he asserted that only Mr. Funderberg saw his use of leave as a problem. However, Mr. Tuck's supervisors testified that Mr. Tuck was unable to consistently arrive at work on time.

### 2. 2012 & 2013 Performance Evaluations

In August 2012, Mr. Tuck received a "4" on his yearly work-performance evaluation, which uses an inverted scale with "1" being the highest rating and "5" being the lowest rating. At the Depot, a "4" rating was not satisfactory and required counseling and correction. Mr. Tuck's performance review specifically noted that Mr. Tuck needed to improve coming to work on time and scheduling leave. (Doc. 20-23 at 2). Mr. Tuck corrected his leave and absenteeism issues over the next year and received a "2" on his 2013 evaluation. (Doc. 29 ¶ 30). Mr. Funderberg approved both ratings.

*3.     Insubordination Incident*

In April 2014, a team "lead," Jeff Phillips, accused Mr. Tuck of insubordination.  Mr. Phillips ordered Mr. Tuck to place tarps on some vehicles.  Mr. Tuck refused because a supervisor had directed him to perform another task.

Mr. Tuck incorrectly believed that team "leads" lacked authority to give commands to rank-and-file employees, describing them in his deposition as "assistant[s] *to* the supervisor." (Doc. 20-2 at 39) (emphasis added).  Because, in Mr. Tuck's mind, Mr. Phillips was merely an assistant *to* the supervisor, Mr. Tuck did not believe that Mr. Phillips could give him commands.

Mr. Phillips, who, in fact, did have the authority to give commands to subordinates, did not just accuse Mr. Tuck of insubordination.  In addition, Mr. Phillips reported that Mr. Tuck suggested a physical fight in addition to refusing the order.  Mr. Tuck denied that allegation.

*4.     Sexual Harassment Allegation*

In May 2014,[1] Teresa Bradford, another coworker, accused Mr. Tuck of two incidents of sexual harassment occurring on or around the same day.  (*See* Doc. 20-13).  First, Ms. Bradford stated that Mr. Tuck had asked her whether her husband was around at night with the implication that Mr. Tuck would be available in a romantic capacity for Ms. Bradford in her husband's absence.  Second, Ms. Bradford asserted that Mr. Tuck had asked about her preferences in "nuts," a statement taken by Ms. Bradford as sexual innuendo.

Mr. Tuck did not deny making the statements, but rather denied that either statement constituted sexual harassment.  In his deposition, for example, Mr. Tuck testified that could not have meant either statement as sexual innuendo because Ms. Bradford, who was in her 50s, was

---

[1] Mr. Tuck disputes the timing of Ms. Bradford's written statement accusing him of sexual harassment and suggests that Ms. Bradford did not write her statement until six weeks after the incident, in July 2014.  Mr. Tuck fails, however, to support this speculation with evidence.

"elderly." (Doc. 20-2 at 32). Mr. Tuck further testified that he thought Ms. Bradford fabricated her outrage to extend her temporary employment to permanent employment and to please her husband, who also worked at the Anniston Army Depot and who, according to Mr. Tuck, had a "great relationship" with Mr. Funderberg. (Doc. 20-2 at 33).

While the Army investigated Ms. Bradford's allegations, Mr. Funderberg moved Mr. Tuck to a different team in a different building on the Anniston Army Depot campus.

5. *Alleged Death Threat*

In early June 2014, another coworker, Corey Murphy, accused Mr. Tuck of threatening to kill him and his family during a phone call after hours and off the Depot's premises. The testimony on how and why the incident arose was unclear and lacked context meaningful to the court. In any event, Mr. Tuck felt it necessary to speak to Mr. Murphy on the phone after work. Mr. Murphy, however, did not want to talk to or meet with Mr. Tuck about their unstated issue. Mr. Tuck nevertheless continued to try to talk with Mr. Murphy, and, during one phone call, allegedly threatened to kill Mr. Murphy and his family.

Mr. Murphy contacted the police about the incident, but told police that he only wanted the incident documented. (*See* doc. 21-2 at 2). When informed about the alleged death threat, Depot security officers escorted Mr. Tuck from his work site to the Depot's counselor, Boyd Scoggins, who questioned Mr. Tuck about the allegations. Satisfied that Mr. Tuck did not present a threat to himself or others, Mr. Scoggins allowed Mr. Tuck to leave and return to his job.

Mr. Tuck maintained that he did not threaten to kill Mr. Murphy or his family during the phone call. In his deposition, Mr. Tuck testified that he believed Mr. Murphy fabricated the allegation because of his supposed familial relation to Mr. Funderberg, although Mr. Tuck also

said that he understood that Mr. Murphy and Mr. Funderberg were not friendly with each other. Mr. Tuck further added his belief that "jealously" and "hate" could have motivated Mr. Murphy to accuse him, and he agreed that Mr. Murphy's complaint may have been "just personal." (Doc. 20-2 at 39).

### 6. Initial EEOC Contact & Union Representative's Meeting With Mr. Funderberg

Mr. Tuck made informal contact with the EEOC on June 25, 2014, suggesting that all the incidents described above—all of which were, in Mr. Tuck's view, false allegations—had been a result of his disability (PTSD) and racial discrimination. (Doc. 20-20 at 4). But Mr. Tuck did not file a complaint at that time.

On or soon after Mr. Tuck made his initial contact with the EEOC in June 2014, Mr. Tuck's union representative met with Mr. Funderberg regarding Mr. Tuck's issues. In his deposition, the union representative testified that, during this meeting, Mr. Funderberg suggested to him or told him that Mr. Tuck was a problem because he had PTSD. (Doc. 28-45 at 18).[2]

### 7. 2014 Performance Evaluation

On August 7, 2014, the Army once again issued to Mr. Tuck a performance evaluation of "4," a poor performance rating. However, after Mr. Tuck challenged the rating, his supervisor revised it to "3," which is a "successful" rating. Specifically, Mr. Tuck's then-current supervisor changed the rating because Mr. Tuck's prior supervisor had failed to give him a mid-term evaluation, thus depriving Mr. Tuck of the opportunity to correct any performance issues prior to the yearly evaluation. (Doc. 28-49 at 32-33). Mr. Funderberg did not direct Mr. Tuck's supervisor to give him the initial "4" rating, nor did he object to the adjustment from "4" to "3."

---

[2] The Army asserts that Mr. Funderberg "vehemently" denies telling the union representative that he thought Mr. Tuck was a problem because of his PTSD. At summary judgment, however, the court makes all reasonable inferences in the non-movant's favor, so the equivocacy of Mr. Funderberg's denial has no bearing on the matter of whether a genuine dispute exists. As discussed below, however, this dispute is not *material*.

(*Id.* at 32, 46).  Mr. Tuck claims that the "4" resulted in his disqualification for a bonus, at least temporarily.  Mr. Tuck received his bonus after the adjustment.  (*Id.* at 43).

8.      *First EEOC Complaint*

On August 15, 2014, Mr. Tuck filed his first EEOC complaint.  In that complaint, Mr. Tuck stated that he had been harassed and discriminated against because of his race and disability.  Specifically, Mr. Tuck identified the Depot's investigation of the June 2014 allegations by Corey Murphy as harassment and discrimination.  Mr. Tuck stated that the allegation against him was false and "outside of the Depot's jurisdiction" to investigate.  (Doc. 20-19 at 1).  In the complaint, Mr. Tuck further claimed that Mr. Funderberg had been orchestrating the harassment, and that Mr. Funderberg was motivated to harass him because of the PTSD.

9.      *Proposed Removal & First Two-Week Suspension*

On September 24, 2014, the Army notified Mr. Tuck of its intent to terminate his employment due to "conduct unbecoming a federal employee."  (Doc. 20-14).  Maurice Wilson, Mr. Tuck's supervisor at the time, testified that he prepared the proposed removal memorandum and did not discuss it with Mr. Funderberg before he prepared it.  (Doc. 28-49 at 54).  However, Mr. Funderberg approved the proposed removal before forwarding it to Mr. Tuck.  Mr. Funderberg would have made the final decision on whether to terminate Mr. Tuck.  Ultimately, however, the Army did not terminate Mr. Tuck.  Instead, the Army suspended Mr. Tuck from February 2 until February 13, 2015, for "conduct unbecoming a federal employee."  (Doc. 28-22 at 1-2).

The removal memorandum identified three specific incidents to support Mr. Tuck's proposed termination and, ultimately, the two-week suspension:  the April 2014 insubordination

incident and contemporaneous disrespect toward a supervisor; the May 2014 alleged sexual harassment; and the June 2014 alleged threats to kill Mr. Murphy and his family.

10. *Second EEOC Complaint*

Mr. Tuck filed a second EEOC complaint on January 15, 2015. Mr. Tuck added the "4" rating on his 2014 performance evaluation and the September 2014 proposed removal to his list of discriminatory acts, and he alleged reprisal as well as discrimination based on his PTSD. Mr. Tuck asserted in his complaint that the Army should not have proposed his termination because the allegations against him were all untrue or distortions of the truth. As noted, the Army ultimately did not terminate Mr. Tuck based on the proposed removal, but suspended him for two weeks in February 2015.

11. *Altercation with Mr. Heath*

Five months later, in May 2015, Mr. Tuck again found himself involved in a confrontation with a coworker, Lee Heath. Mr. Tuck had arrived at the Depot on a Saturday for overtime work, and he had received instructions from his supervisor, who was off-site, to fill out a time log, which was located in a particular building on the Depot's campus.

However, Mr. Tuck went into a different building, entered his supervisor's office, and rummaged through his papers, apparently looking for a different time log. (Doc. 28-44). Having heard Mr. Tuck enter the office from another room, Mr. Heath entered and told Mr. Tuck to leave, but Mr. Tuck maintained that he had a right to be in the supervisor's office. Mr. Tuck testified that Mr. Heath then initiated a physical altercation from which Mr. Tuck quickly retreated. (Doc. 20-2 at 25).

Mr. Tuck testified that he thought Mr. Funderberg put Mr. Heath up to the task to provoke Mr. Tuck into lashing out. (Doc. 20-2 at 25-26). Alternatively, Mr. Tuck suggested that

Mr. Heath, of his own volition, attacked him as an unrequested personal favor to Mr. Funderberg. (Doc. 20-2 at 26). Or, as a final alternative, Mr. Tuck said that perhaps Mr. Heath "knew about all the other harassment that was going on and . . . wanted to join in." (*Id.*).

12.    *Third EEOC Complaint*

Mr. Tuck filed a third EEOC complaint on July 6, 2015. In this complaint, Mr. Tuck added that the physical altercation with Mr. Heath was part of the continuing harassment against him. (Doc. 20-22 at 1). Mr. Tuck noted that he wished to be moved to another division to eliminate the harassment.

13.    *2015 Performance Evaluation*

Mr. Tuck received a "3" on his August 2015 yearly-performance evaluation, which was completed by Mr. Funderberg and Mr. Tuck's then-supervisor. (Doc. 28-30).

14.    *Second Two-Week Suspension*

On August 25, 2015, the Army suspended Mr. Tuck for two-weeks because of the incident with Lee Heath. Specifically, the Army cited Mr. Tuck for disobeying his supervisor's instructions, for acting disrespectfully toward Mr. Heath, and for rummaging through a supervisor's desk. (Doc. 28-44). The Army also suspended Mr. Heath for initiating the physical confrontation. (Doc. 28-46 at 15).

15.    *Requested Transfer*

In September 2015, Mr. Tuck requested that the Army transfer him from the Stryker division to another division. In his written request, Mr. Tuck stated that he was "not being treated fairly" by Mr. Funderberg, who managed the Stryker division, and that he was "being stressed causing further aggravation to [his] mental health caused by [his] PTSD." (Doc. 20-16). Mr. Funderberg accepted Mr. Tuck's request for a transfer and temporarily reassigned him to

another division.  However, the position with the other division was not permanent and Mr.

Funderberg soon recalled Mr. Tuck to fill a need in the Stryker division, which was shorthanded.

    *16.    Retirement*

    When Mr. Tuck returned to Mr. Funderberg's Stryker division, his direct supervisor

noted that Mr. Tuck was eligible for retirement.  Mr. Tuck had not known that he was eligible for

retirement, but began to consider retiring because he "just wanted to get out of [Mr.

Funderberg's] division."  (Doc. 20-2 at 43).  Mr. Tuck wanted to continue working, but felt that

he needed to pursue retirement if he could not get away from Mr. Funderberg.

    In November 2015, Mr. Tuck applied for early retirement based on disability.  In a

statement accompanying Mr. Tuck's application for retirement, a supervisor noted that Mr. Tuck

had been excessively absent, that the Depot could not accommodate Mr. Tuck's absences, and

that he had tried without success to transfer Mr. Tuck to another division as Mr. Tuck had

requested.  The supervisor added that the workloads of other divisions did not support a transfer.

(Doc. 20 ¶ 70).  Ultimately, the Army granted Mr. Tuck's application for early retirement and

awarded Mr. Tuck disability and retirement benefits.

## DISCUSSION

    Mr. Tuck focuses his allegations on his belief that Mr. Funderberg orchestrated Mr.

Tuck's coworkers' accusations in an effort to eventually justify Mr. Tuck's termination.  As

noted above, Mr. Tuck has four claims remaining in his lawsuit: disability discrimination based

on disparate treatment (Count 1); disability discrimination based on failure to accommodate

(Count 2); retaliation for his complaints of disability and racial discrimination (Count 3); and

constructive discharge because of a hostile work environment (Count 5).  The court finds that

none of Mr. Tuck's claims survives the Army's motion for summary judgment. The court discusses the reasons for that finding for each of Mr. Tuck's claims in turn.

A.    *Count 1: Disability Discrimination Based on Disparate Treatment*

In his first charge, Mr. Tuck contends that the Army treated him less favorably than similarly-situated employees without PTSD. Initially, Mr. Tuck asserts that the case contains direct evidence of disability discrimination and disparate treatment because Mr. Funderberg told Mr. Tuck's union representative that Mr. Tuck was a problem because he had PTSD.

Evidence is "direct" in an employment-discrimination case if it proves that a discriminatory act occurred without requiring an inferential step. *See, e.g.*, *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) ("[T]he quintessential example of direct evidence would be a management memorandum saying, 'Fire Earley-he is too old.'"); *Roberts v. Design & Mfg. Servs., Inc.*, 167 Fed. Appx. 82, 85 (11th Cir. 2006) (rejecting claim of direct evidence because the decision maker "never stated that *he was going to fire Roberts because he was too old*" only that the plaintiff "was getting too old") (emphasis in original). Mr. Funderberg's statement is not direct evidence of disability discrimination; it is merely evidence that Mr. Funderberg had, at most, a discriminatory animus. Although Mr. Funderberg indicated that he thought Mr. Tuck was a problem because of his PTSD, he did not command any particular action against Mr. Tuck alongside that statement. The evidence is, therefore, circumstantial because a fact finder would need to *infer* that any later act against Mr. Tuck by Mr. Funderberg was motivated because of his discriminatory animus; the statement might suggest a discriminatory act, but, on its own, does not prove one.

As to circumstantial evidence, Mr. Tuck argues that he can survive summary judgment under either the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973), or the "convincing mosaic of evidence" method. The court addresses the burden-shifting framework first and the convincing mosaic of evidence method second. However, neither method of proof succeeds in convincing the court that a jury question exists as to disparate treatment.

### 1. Burden-Shifting Framework

To establish a *prima facie* case of disparate treatment disability discrimination using the *McDonnell Douglas* burden-shifting framework, the plaintiff must point to evidence that (1) he belongs to a protected class, such as disabled individuals; (2) he was qualified for his position and subjected to an adverse employment action; and (3) his employer treated similarly-situated, non-disabled employees more favorably. *Gooden v. Internal Revenue Service*, 679 Fed. Appx. 958, 964 (11th Cir. 2017); *see also McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (stating that a plaintiff must produce evidence of similarly-situated comparators when he alleges that other employees engaged in similar conduct were not similarly disciplined). Moreover, the plaintiff must show that "he suffered an adverse employment action 'solely by reason of' his handicap." *Tarmas v. Sec'y of Navy*, 433 Fed. Appx. 754, 761-62 (11th Cir. 2011) (citing the Rehabilitation Act, 29 U.S.C. § 794(a)).

If the plaintiff meets his burden to establish a *prima facie* case, then the defendant must produce a legitimate, non-discriminatory reason for the adverse employment action. *Gooden*, 679 Fed. Appx. at 964. If the defendant produces a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to establish sufficient evidence of pretext. *Id.*

The Army does not contest that Mr. Tuck belongs to a protected class, namely, persons with PTSD, which is a disability. However, the Army contests Mr. Tuck's assertion that he was subjected to any adverse employment actions, as well as his assertion that the Army treated

similarly-situated employees more favorably than him.[3] Although the court finds that Mr. Tuck was subjected to some adverse actions, the court agrees with the Army that Mr. Tuck has failed to offer sufficient evidence identifying any similarly-situated comparator.

     *a.    Adverse Actions*

Under the *McDonnell Douglas* framework, a plaintiff must show that his employer made an adverse decision that "impact[ed] the terms, conditions, or privileges of [his] job in a real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (addressing a discrimination claim under Title VII) (internal quotation marks omitted). The impact must be "serious and material," and a reasonable person in the circumstances presented must have found that the action was materially adverse. *Id.*

The court finds only three adverse actions in this case: Mr. Tuck's temporary disentitlement to a bonus as a result of his 2014 performance review; Mr. Tuck's first two-week suspension in February 2015; and Mr. Tuck's second two-week suspension in August 2015. Only those three events were potentially sufficiently "serious and material" while also affecting the terms, conditions, or privileges of Mr. Tuck's employment in any "real and demonstrable way." *See Davis*, 245 F.3d at 1239.[4]

In his brief opposing summary judgment, Mr. Tuck provides a lengthy chronicle of other occurrences and incidents that he contends were "adverse actions," such as his being labeled as a

---

[3] The Army also contends that Mr. Tuck was no longer qualified for his position, that it had a legitimate, non-discriminatory reason for taking any adverse action, and that Mr. Tuck cannot establish pretext. The court, however, need not reach those arguments because the court finds that Mr. Tuck failed to establish a *prima facie* case.

[4] The court addresses—and rejects—Mr. Tuck's argument that his retirement constituted a constructive discharge because of a hostile work environment below in Section D. Mr. Tuck does not argue that the Army *coerced* him into retirement by, for example, threatening to fire him if he did not agree to early retirement. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (11th Cir. 2005).

"troublemaker" by Mr. Funderberg, the various accusations against him made by coworkers, and other issues regarding his use of leave.  However, these actions are not "adverse actions" under the meaning of the Rehabilitation Act because none of them affected his employment in a sufficiently material and real or demonstrable way.  Mr. Tuck may not have *liked* that his coworkers accused him of misconduct or that his supervisors considered him to be a nuisance, but these incidents did not impact his employment in the same demonstrable way as his two-week suspensions or even the temporary loss of the bonus.

      *b.*     *Similarly-Situated Comparators Treated Differently*

      Mr. Tuck's claim under the burden-shifting framework fails, however, because he does not identify any similarly-situated comparator.  Mr. Tuck offers the court at least 15 names of individuals who, according to Mr. Tuck, engaged in workplace violence, arguments, or insubordination and were not disciplined.  But, outside their *names*, Mr. Tuck provides the court virtually no information or evidence about these individuals, apparently expecting the court to divine the requisite knowledge to find any potential comparator "similarly situated."

      As to the *one* potential comparator about whom Mr. Tuck actually offers evidence, he fails to show that the asserted comparator—Lee Heath—meets the Eleventh Circuit's expectations for the role.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) ("To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff *in all relevant respects.*"). "[T]he quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).  Mr. Tuck offers no evidence that Mr. Heath had the same history of infractions or the *cumulative* history similar or

equal to Mr. Tuck.  Lee Heath was barely similar to Mr. Tuck in any respect, let alone "nearly identical" in all relevant respects.  And, even ignoring the critical issue of similarity, the Army disciplined Mr. Heath in the same manner as it disciplined Mr. Tuck.

As Mr. Tuck has failed to identify a similarly-situated comparator, Mr. Tuck cannot succeed under the *McDonnell Douglas* standard.

2.      *Convincing Mosaic of Evidence*

Notwithstanding his failure to establish his *prima facie* disparate-treatment case under the burden-shifting framework with the appropriate evidence, Mr. Tuck could show that a "convincing mosaic" of circumstantial evidence of discrimination establishes that a triable disparate-treatment issue exists.  *See Lockheed-Martin Corp.*, 644 F.3d at 1327 ("[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.").  Mr. Tuck argues that the entire weight of the evidence, even if not squarely within the boxes created by *McDonnell Douglas*, is sufficient to raise a jury question about discrimination based on his disability.  The court disagrees.

The question is whether, considering the totality of the circumstances, "the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff . . . ." *Lockheed-Martin Corp.*, 644 F.3d at 1328.  Mr. Tuck fails to identify any convincing evidence that reasonably supports an inference that the Army suspended him or temporarily withheld his 2014 bonus because of his disability.  Rather, the Army offered multiple compelling and non-discriminatory reasons for its adverse actions, including the sexual harassment complaint, alleged death threats, insubordination, and consistent issues with proper use of leave.  Mr. Tuck's case rests on, at most, tenuous evidence of unfair treatment in how the Army investigated or

considered those incidents. *See Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair.") (internal citation omitted).

Attempting to evade that almost self-apparent conclusion, Mr. Tuck argues that Mr. Funderberg, his second-level supervisor, orchestrated the allegations and bad performance reviews with the ultimate goal of finding a reason to terminate him. Self-serving statements can defeat a motion for summary judgment, but speculation made without personal knowledge or observation cannot. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018). So when Mr. Tuck argues, in effect, that Mr. Funderberg acted like the puppet-master Stromboli[5],—tugging at his subordinates' "strings" and casting whatever discriminatory motive he may have had upon them—Mr. Tuck must offer something more than just his personal feelings about his coworkers' actions. But, in conjuring the "strings" connecting his coworkers' accusations to Mr. Funderberg's possible discriminatory animus, Mr. Tuck grasps solely to his own speculation.

Considered in the light most favorable to him, the *evidence* is insufficient to push Mr. Tuck's case beyond summary judgment. Indeed, Mr. Tuck's direct supervisors testified that they acted their own accord, initiating the adverse actions about which Mr. Tuck complains and then seeking Mr. Funderberg's ultimate approval of their recommendations, all of which had several compelling and non-discriminatory reasons to support them. The court thus sees little merit in Mr. Tuck's argument that he can survive summary judgment based on a convincing mosaic of circumstantial evidence.

Mr. Tuck has failed to show that a reasonable jury could make a finding of discrimination under either the *McDonnell Douglas* burden-shifting framework or the "convincing mosaic of

---

[5] PINOCCHIO (Walt Disney Productions 1940).

evidence" method. The court will thus GRANT the Army's motion for summary judgment on Mr. Tuck's disparate treatment claim.

> B.        *Count 2: Failure to Accommodate*

In addition to his disparate treatment theory, Mr. Tuck alleges that the Army discriminated against him by failing to provide a reasonable accommodation for his disability. Under the Rehabilitation Act, like the ADA, the plaintiff, must be "disabled," "qualified," and his employer must have denied him a "reasonable accommodation." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1310 (11th Cir. 2007).

First, to establish a disability, the plaintiff must have a physical or mental impairment that substantially limits one or more major life activities, a record of such impairment, or be "regarded as" having such an impairment. 29 U.S.C. § 705(9)(B) (cross-referencing 42 U.S.C. § 12102); *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017). Here, as above regarding Mr. Tuck's disparate treatment claim, the Army does not contest that Mr. Tuck's PTSD was a mental disability sufficient to trigger protection under the Rehabilitation Act. Second, to be a qualified individual under the Rehabilitation Act, the plaintiff must be able to perform his essential job functions with or without reasonable accommodation. *Boyle*, 866 F.3d at 1288. Third, an employer unlawfully discriminates against a disabled plaintiff by failing to provide him a reasonable accommodation. *Id.* at 1289.

The Army contends that Mr. Tuck was not a qualified employee and that his requested accommodation—transfer to a different division outside of Mr. Funderberg's purview—was not reasonable.

Even assuming Mr. Tuck's continued qualification for the position he occupied, the court finds that Mr. Tuck's requested accommodation was unreasonable under the circumstances. The

Rehabilitation Act does not require an employer to create a new position for an employee with disabilities. *See Boyle*, 866 F.3d at 1289; *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995) ("Several courts have held that transferring disabled individuals solely to allow the employee to work in a different setting or under a different supervisor is not an accommodation reasonably to be expected.").

In this case, Mr. Tuck has failed to show that the Depot had an available position in a different division for which Mr. Tuck was qualified. Although the Army tried to move Mr. Tuck when another position became *temporarily* available, Mr. Tuck's application for retirement benefits reflected that the relative workloads of other divisions were insufficient to make a permanent transfer reasonable. Mr. Funderberg likewise testified that his division was shorthanded. The lack of evidence about another available position and the Army's evidence regarding its needs in the Stryker division combine to compel a conclusion that Mr. Tuck's request to be moved to a different division was unreasonable.

Mr. Tuck requested no accommodation other than transfer. The court will accordingly GRANT the Army's motion for summary judgment as to Mr. Tuck's reasonable accommodation claim.

C.    *Count 3: Retaliation*

Mr. Tuck alleges that the Army retaliated against him for filing an EEOC complaint about disability and racial discrimination. Retaliating against an employee who complains about disability discrimination violates the Rehabilitation Act. *Burgos v. Chertoff*, 274 Fed. Appx. 839, 842-43 (11th Cir. 2008) (citing 29 U.S.C. §§ 791(g), 793(d), and 794(d), which incorporate the ADA's anti-retaliation provision). Much like disparate-treatment claims, courts use *McDonnell Douglas* to evaluate retaliation claims based on circumstantial evidence at the

summary judgment stage. *See id.*

To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) he engaged in a statutorily protected activity, such as complaining about disability discrimination to the EEOC; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity. *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010). Furthermore, as to the third element, the plaintiff must show that the statutorily protected activity was the but-for reason for the adverse action. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013) (addressing retaliation claims under Title VII); *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000). Although an adverse action's temporal proximity to a complaint about discrimination often suffices to show but-for causation for the purposes of a *prima facie* case, "the rule of temporal proximity is not absolute." *Singleton v. Public Health Trust of Miami-Dade County*, 725 Fed. Appx. 736, 739 (11th Cir. 2018) ("[N]o rational jury could infer retaliatory intent from the mere fact Singleton received another citation for failing to be minimally productive—even if the citation followed shortly after an accommodations request.").

The Army argues that Mr. Tuck fails to show but-for causation as to his filing of EEOC complaints, and the court agrees. As discussed above, at best, only three adverse actions occurred in this case: the disentitlement to the bonus in 2014; the two-week suspension in February 2015; and the two-week suspension in August 2015. The court finds insufficient evidence to raise a jury question that Mr. Tuck's EEOC complaints were the but-for cause of any of these adverse actions.

Mr. Tuck began filing EEOC complaints in 2014 and continued through 2015, so a loose temporal connection exists between the three adverse actions and Mr. Tuck's three EEOC

complaints. But, first, only Mr. Tuck's speculation supports a finding that the direct supervisor who rated Mr. Tuck a "4" in 2014 knew at that time that Mr. Tuck had made any contact with the EEOC. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (holding that plaintiff must show that the decision maker was aware of the protected activity). Notably, Mr. Tuck—who had once before received a rating of "4" because of his issues with following the proper procedure for leave—received the 2014 rating *before* he made "formal" contact with the EEOC, and he only shows evidence that Mr. Funderberg—not his supervisor—had been made aware of the informal contact. As stated above, insufficient evidence supports Mr. Tuck's belief that Mr. Funderberg directed his subordinates to rate Mr. Tuck unfairly.

Second, as to the suspensions, the numerous other reasons supporting them overshadow the minute temporal connections to Mr. Tuck's EEOC complaints. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that temporal proximity must be "very close" where no other evidence shows causation); *see also Whatley v. Metro Atlanta Rapid Transit*, 632 F.2d 1325, 1329 (5th Cir. 1980) ("The evidence reveals . . . that the dismissal was a culmination of problems growing out of [plaintiff's] manner of handling his job . . . ."). The sexual harassment allegations, the insubordination, and the alleged death threat—incidents that predated Mr. Tuck's contact with the EEOC—preclude the court from finding that a genuine issue of fact exists as to whether Mr. Tuck's EEOC complaint was a "but for" cause of the first suspension.

Mr. Tuck's disobeying of his direct supervisor's instructions and his unauthorized entry into that supervisor's office likewise precipitated the second suspension and no evidence other than the temporal connection between the suspension and the EEOC complaint suggests anything to the contrary. As discussed above, Mr. Tuck tries to connect his coworkers and direct

supervisors' actions with some discriminatory or retaliatory animus harbored by Mr. Funderberg. However, as with his disparate treatment claim, he fails to provide evidence warranting such a connection or inference. Mere speculation does not suffice.

The court will GRANT the Army's motion for summary judgment as to Mr. Tuck's retaliation claim.

D.      *Count 5: Hostile Work Environment*

In his final remaining charge, Mr. Tuck asserts that the Army constructively discharged him by subjecting him to a hostile work environment.[6] As with his disparate treatment claim, Mr. Tuck asserts that Mr. Funderberg, pulling the strings of his subordinates, harassed him based on his disability, PTSD.

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting *Munday v. Waste Mgmt. of North Amer., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)). To be sufficiently intolerable, the work environment must be both *subjectively* abusive to the employee and *objectively* hostile. *Blackmon v. Wal-Mart Stores E.*, 358 Fed. Appx. 101, 102 (11th Cir. 2009). Teasing, offhand comments, and isolated incidents— "unless extremely serious"—do not rise to the level of harassment. *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Furthermore, the hostile work environment "is not a shield against harsh treatment at the workplace . . . The plaintiff cannot turn a personal feud into a [] discrimination case . . . ." *Succar v. Dade Cnty. School Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000). Rather, the

---

[6] The court assumes that the Rehabilitation Act creates a claim for hostile work environment. *See Wolfe v. Postmaster General*, 488 Fed. Appx. 465, 469 (11th Cir. 2012) ("We assume, without deciding, as the district court did, that a hostile work environment claim is cognizable under the Rehabilitation Act.").

treatment *must* be "based on a protected characteristic of the employee[.]" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

As an initial matter, the Army asserts that Mr. Tuck failed to exhaust his administrative remedies because he did not file a hostile work environment claim with the EEOC. However, Mr. Tuck's complaints to the EEOC repeatedly reference and allege the same pattern of harassment that he maintains in this lawsuit. The court thus finds that Mr. Tuck exhausted his administrative remedies.

In any event, the court agrees with the Army's alternative argument that any "harassment" lacked a discriminatory animus. Mr. Tuck himself described the numerous incidents in which he was involved in terms of personal feuds with his coworkers, and, as discussed throughout this Opinion, he fails to connect those feuds with a discriminatory animus. At most, Mr. Tuck asserts that the Army took unfair or unjustified action against him. But an employer may take an adverse action against an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). Indeed, Mr. Tuck uses most of his brief on summary judgment to explain why the allegations made against him were false, not to explain why the Army's decision makers had a discriminatory motive in taking actions adverse to him.

The court will GRANT the Army's motion for summary judgment as to Mr. Tuck's hostile work environment claim.

## CONCLUSION

Mr. Tuck filed a discrimination lawsuit, but, at best, presented a case about unfair treatment. Lacking evidence linking discriminatory or retaliatory intent to an adverse act, Mr.

Tuck has failed to show that a genuine issue of material fact exists as to his disparate treatment, hostile work environment, or retaliation claims.  As to Mr. Tuck's failure-to-accommodate claim, Mr. Tuck failed to identify a reasonable accommodation for his disability.  The court will thus GRANT the Army's motion for summary judgment in all respects.

      **DONE** and **ORDERED** this 7th day of August, 2018.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE